ORIGINAL

PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

06-137

| United States District Court | District Delaware |
|---|---|
| Name (under which you were convicted): | Docket or Case No.: [illegible] |
| Place of Confinement: Delaware Correctional Center | Prisoner No.: 317479 |
| Petitioner (include the name under which you were convicted) Mustafa A. Whitfield | v. Respondent (authorized person having custody of petitioner) Thomas Carrol |
| The Attorney General of the State of Carl Danberg | |

FILED

FEB 28 2006

U.S. DISTRICT COURT DISTRICT OF DELAWARE

PETITION

1. (a) Name and location of court that entered the judgment of conviction you are challenging: New Castle County Superior Court 500 King Street Wilmington Delaware 19802

   (b) Criminal docket or case number (if you know): 0210009174

2. (a) Date of the judgment of conviction (if you know): Febuary 6 2004

   (b) Date of sentencing: April 16, 2004

3. Length of sentence: 11 years (level 5)

4. In this case, were you convicted on more than one count or of more than one crime? Yes ☑ No ☐

5. Identify all crimes of which you were convicted and sentenced in this case: Att. Robbery 1st (4 years level 5) Aslt 2nd (1 Level 5) PFDCF (3 years level 5) Reck End 1st (2 years level 3) PFDCF (3 years level 5) Disguise (2 years level 2) Consp 2nd (1 year level 2)

6. (a) What was your plea? (Check one)

   (1) Not guilty ☑ (3) Nolo contendere (no contest) ☐

   (2) Guilty ☐ (4) Insanity plea ☐

   (b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to? N/A

(c) If you went to trial, what kind of trial did you have? (Check one)

Jury ☑ Judge only ☐

7. Did you testify at a pretrial hearing, trial, or a post-trial hearing?

Yes ☑ No ☑

8. Did you appeal from the judgment of conviction?

Yes ☑ No ☐

9. If you did appeal, answer the following:

(a) Name of court: Delaware Supreme Court

(b) Docket or case number (if you know): 0210009174

(c) Result: Denied

(d) Date of result (if you know): December 29, 2004

(e) Citation to the case (if you know): N/A

(f) Grounds raised: ① charges included in each other ② a compromise verdict from the jury and ③ Superior Court judge abused discretion when denying Washington jury instructions.

(g) Did you seek further review by a higher state court? Yes ☐ No ☑

If yes, answer the following:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Result:

(4) Date of result (if you know):

(5) Citation to the case (if you know):

(6) Grounds raised:

(h) Did you file a petition for certiorari in the United States Supreme Court? Yes ☐ No ☑

If yes, answer the following:

(1) Docket or case number (if you know):

(2) Result: ______

(3) Date of result (if you know): ______

(4) Citation to the case (if you know): ______

10. Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?

Yes ☑ No ☐

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court: New Castle County Superior Court

(2) Docket or case number (if you know): 0210004174

(3) Date of filing (if you know): ______

(4) Nature of the proceeding: Motion to compel

(5) Grounds raised: I requested a copy of my affidavit for probable cause to be signed. Meaning I requested a copy which had a judges signature on it.

(6) Did you receive a hearing where evidence was given on your petition, application, or motion? Yes ☐ No ☑

(7) Result: Denied

(8) Date of result (if you know): ______

(b) If you filed any second petition, application, or motion, give the same information:

(1) Name of court: New Castle County Superior Court

(2) Docket or case number (if you know): 0210004174

(3) Date of filing (if you know): ______

(4) Nature of the proceeding: Motion for Hebeas Corpus

(5) Grounds raised: My arrest was illegal and illegal search and seizure.

(6) Did you receive a hearing where evidence was given on your petition, application, or motion? Yes ☐ No ☑

(7) Result: Denied

(8) Date of result (if you know):

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court: New Castle County Superior Court

(2) Docket or case number (if you know): 0210009174

(3) Date of filing (if you know): March 8, 2005

(4) Nature of the proceeding: Motion for Postconviction Relief

(5) Grounds raised: Illegal arrest and illegal search and seizure. Illegal Arrest: Officer lied to establish probable cause for my arrest. Illegal search and seizure: Officer lied to seize evidence.

(6) Did you receive a hearing where evidence was given on your petition, application, or motion? Yes ☐ No ☑

(7) Result: Denied

(8) Date of result (if you know):

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1) First petition: Yes ☐ No ☑

(2) Second petition: Yes ☐ No ☑

(3) Third petition: Yes ☑ No ☐

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

On the first and second I didn't know I could appeal.

12. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

GROUND ONE: Illegal Arrest and Detention

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): On October 15, 2002. I was arrested for a robbery. I was charge because my affidavit stated that two police officers by the names off David Prado and Matthew Derbyshire positively identified me as a suspect. Which was false because they never saw the suspects faces, couldn't tell their faces and according to Prado only saw dark clothing from over a block away on a dimly lit street, yet I was positively identified by them according to the affidavit.

(b) If you did not exhaust your state remedies on Ground One, explain why: N/A

(c) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐ No ☑

(2) If you did not raise this issue in your direct appeal, explain why: My attorney said it was legal for the police to lie in affidavits because probable cause covers a broad area.

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court? Yes ☑ No ☐

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: postconviction and habeas corpus

Name and location of the court where the motion or petition was filed:
New Castle County Court House 500 King Street Wil, DE. 19801

Docket or case number (if you know):

Date of the court's decision: June 27, 2005

Result (attach a copy of the court's opinion or order, if available): The court cited that I was convicted on circumstantial evidence at trial or abundant circumstantial evidence linked me to the crime residence which didn't →

(3) Did you receive a hearing on your motion or petition?

Yes ☐ No ☑

(4) Did you appeal from the denial of your motion or petition?

Yes ☑ No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

Yes ☑ No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: Delaware Supreme Court 55 The Green P.O BOX 476 Dover Delaware 19903

Docket or case number (if you know): No. 327 2005

Date of the court's decision: December 13, 2005

Result (attach a copy of the court's opinion or order, if available): ~~[illegible]~~ The Supreme Court agreed with the Superior Court but it didn't illaborate. (See attached)(Pages 1-3)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: N/A

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One: Motion for Rehearing Enbank denied. (Page 4)

GROUND TWO: Illegal Search and Seizure

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): Warrants with false information. DNA warrants which have misleading information say Whitfield was seen running with suspects and a victims description of the suspects which doesn't agree with the real statement which was on tape →

(b) If you did not exhaust your state remedies on Ground Two, explain why: N/A

(c) **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐ No ☑

(2) If you did not raise this issue in your direct appeal, explain why: My attorney said it was legal to lie because probable cause has a broad area.

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

Yes ☑ No ☐

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: Post conviction relief

Name and location of the court where the motion or petition was filed: New Castle County Superior Court 500 King Street Wilmington DE. 19801

Docket or case number (if you know):

Date of the court's decision: June 27, 2005

Result (attach a copy of the court's opinion or order, if available): N/A

(3) Did you receive a hearing on your motion or petition?

Yes ☐ No ☑

(4) Did you appeal from the denial of your motion or petition?

Yes ☑ No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

Yes ☑ No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: Delaware Supreme Court 55 The Green P.O. Box 476 Dover Delaware 19903

Docket or case number (if you know): 327,2005

Date of the court's decision: December 13, 2005

Result (attach a copy of the court's opinion or order, if available): Pages 1-3

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: N/A

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two: I filed for a motion for Rehearing Enbanc, which was denied. (Page 4)

**GROUND THREE:** Prosecution Misconduct

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): State prosecutor's knowingly prosecuted off false reports. They new the police didn't identify me, even though the prosecution said they would. The State's case was base off a identification which was false and they knew it but still prosecuted.

(b) If you did not exhaust your state remedies on Ground Three, explain why: The Delaware Supreme Court never ruled on it, even though I put it in my appeal for post conviction relief.

(c) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐ No ☑

(2) If you did not raise this issue in your direct appeal, explain why: I did not see it.

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court? Yes ☐ No ☑

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: N/A

Name and location of the court where the motion or petition was filed: N/A

Docket or case number (if you know): N/A

Date of the court's decision: N/A

Result (attach a copy of the court's opinion or order, if available): N/A

(3) Did you receive a hearing on your motion or petition?

Yes ☐ No ☑

(4) Did you appeal from the denial of your motion or petition?

Yes ☐ No ☑

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

Yes ☑ No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: Delaware Supreme Court 55 The Green Dover Delaware 19903

Docket or case number (if you know): 327,2005

Date of the court's decision: December 13, 2005

Result (attach a copy of the court's opinion or order, if available): The Court never ruled on it. (See pages 1-3)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: N/A

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three: Motion For Rehearing EnBanc Denied (Page 4)

GROUND FOUR: ______________________________________________

______________________________________________

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

(b) If you did not exhaust your state remedies on Ground Four, explain why: ______________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

(c) **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ❑ No ❑

(2) If you did not raise this issue in your direct appeal, explain why: ______________

______________________________________________

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court? Yes ❑ No ❑

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: ______________________________

Name and location of the court where the motion or petition was filed: ______________

______________________________________________

Docket or case number (if you know): ______________________________

Date of the court's decision: ______________________________

Result (attach a copy of the court's opinion or order, if available): ______________

______________________________________________

______________________________________________

(3) Did you receive a hearing on your motion or petition?

Yes ❑ No ❑

(4) Did you appeal from the denial of your motion or petition?

Yes ❑ No ❑

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐ No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: ______

Docket or case number (if you know): ______

Date of the court's decision: ______

Result (attach a copy of the court's opinion or order, if available): ______

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: ______

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four: ______

13. Please answer these additional questions about the petition you are filing:

(a) Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction? Yes ☑ No ☐

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them: N/A

(b) Is there any ground in this petition that has not been presented in some state or federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them: N/A

14. Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition? Yes ☐ No ☑

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy of any court opinion or order, if available. N/A

15. Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging? Yes ☐ No ☑

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised. N/A

16. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: N/A

(b) At arraignment and plea: N/A

(c) At trial: Joseph M. Bernstein, Esquire 800 N. King Street - Suite 302 Wilmington DE. 19801

(d) At sentencing: Joseph M. Bernstein, Esquire 800 N. King Street Suite 302 Wilmington Delaware 19801

(e) On appeal: Joseph M. Bernstein (same address above)

(f) In any post-conviction proceeding: N/A

(g) On appeal from any ruling against you in a post-conviction proceeding: N/A

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging? Yes ☐ No ☑

(a) If so, give name and location of court that imposed the other sentence you will serve in the future: N/A

(b) Give the date the other sentence was imposed: N/A

(c) Give the length of the other sentence: N/A

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future? Yes ☐ No ☑

18. TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.* Because my conviction was final December 29, 2004 (The Date the Delaware Supreme Court denied my direct appeal) or it could have been finale in February 9, 05 when the Court (Delaware Supreme) denied my Motion for Rehearing Enbanc. The time stopped on March 8, 2005 when my post-conviction relief was filed. The judgment on my post-conviction relief was Denied (Rehearing Enbanc) on January 9, 2006. For almost a year I've been going through my post-conviction relief. I haven't had the time to file these issues.

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1) A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of —

(continued...)

Therefore, petitioner asks that the Court grant the following relief: That I be released or given a fair trial.

or any other relief to which petitioner may be entitled.

_______________________
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on _______________ (month, date, year).

Executed (signed) on _______________ (date).

Mustafa Whitfield
Signature of Petitioner

*(...continued)
(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;
(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

From: Mustafa Whitfield
317479-21
D.C.C. 1181 Paddock Road
1181 Paddock Road Smyrna, Delaware 19977

UNITED STATES POSTAL SERVICE
0000
AMOUNT
$2.7

U.S.M.S. X-RAY

To: Us District Court
Lockbox 18 Boggs Federal
Building 844 King Street
Wilm. Del. 19801

ReadyPost

REDACTED

06-137

Appendix (Included as Facts)

Please excuse the writting on the papers.

Pages 1-3: Delaware Supreme Court denied appeal (post convicti

Page 4: Motion Rehearing En Banc Denied

Pages 5-6: Affidavit saying I was positively identified by officers (David Prado and Matthew Derbyshire) as a suspect.

Page 7: Matthew Derbyshire testifing he didn't see the suspects faces. (Presecution questioning)

Page 8-A: Matthew Derbyshire saying he got a good look at the suspects backs. (Defense questioning)

Page 9: David Prado testifing he could not tell the suspects races. (Prosecution questioning)

Page 10: David Prado testifing you couldn't tell facial wise who it was, all you saw was dark clothing (Defense questioning)

Page 11: Prosecutor Martin B. O'Connor claiming David Prado and Matthew Derbyshire would testify they saw me (Mustafa Whitfield) and Emmanuel Robinson jump a brick wall. And O'Connor claiming Prado recognized us as suspects.

Page 12: Warrant stating the victim described what myself and

Emmanuel Robinson had on and it states that Mustafa Whitfield and Emmanuel Robinson were seen running seconds after the crime.

Page 13: The victims actual description of the suspects wearing military like clothing looking like twins.

Page 13-A: The victim (Athony Meek) testifing all he remembered was they looked like twins. (Which you don't see on page 12)

Page 14: Matthew Derbyshire testifing the last time he was the two suspects who jumped over the fence that night, was when they jumped over the fence and he type a report.

Page 15: Detective Stephen Misetic claiming Matthew Derbyshire and David Prado saw me jump over a fence.

Page 16: Detective Misetic claiming Mustafa Whitfield was positively identified as the suspects seen running with Coleman

Niether Prado or Derbyshire testified the saw me nor positively identified me like Misetic warrants and reports say, and like the State claimed they would and every report is based off this information.

17

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MUSTAFA WHITFIELD, | § | |
| | § | |
| Defendant Below-Appellant, | § | No. 327, 2005 |
| | § | |
| | § | Court Below—Superior Court |
| v. | § | of the State of Delaware, |
| | § | in and for New Castle County |
| STATE OF DELAWARE, | § | Cr. ID. 0210009174 |
| | § | |
| Plaintiff Below-Appellee. | § | |
| | § | |

Submitted: October 7, 2005
Decided: December 13, 2005

Before **STEELE**, Chief Justice, **BERGER**, and **RIDGELY**, Justices.

**ORDER**

This 13th day of December 2005, upon consideration of the parties' briefs and the record below, it appears to the Court that:

(1) The appellant, Mustafa Whitfield, filed this appeal from the Superior Court's denial of his first motion for postconviction relief. We find no merit to Whitfield's appeal. Accordingly we affirm the Superior Court's judgment.

(2) The record reflects that, in February 2004, a Superior Court jury convicted Whitfield and two codefendants of multiple offenses including attempted first degree robbery and weapon charges. The Superior Court sentenced Whitfield to eleven years in prison followed by decreasing

levels of supervision. This Court affirmed Whitfield's convictions and sentences on direct appeal.* In his motion for postconviction relief, Whitfield asserted two claims entitled, respectively, "Illegal Arrest and Detention" and "Search and Seizure in Violation of the Fourth Amendment." In essence, however, both claims challenge the veracity of the arresting officers' testimony and the lack of forensic evidence linking him to the crime. The Superior Court noted that Whitfield's identity as one of the perpetrators was argued vigorously at trial. The Superior Court concluded that the circumstantial evidence that tied Whitfield to the crime was abundant and thus sufficient for the jury to find him guilty beyond a reasonable doubt.

(3) After careful consideration of the parties' respective positions and the record below, we find it manifest that the judgment of the Superior Court should be affirmed on the basis of the Superior Court's well-reasoned decision dated June 27, 2005. The Superior Court did not err in concluding that Whitfield's motion for postconviction relief was without substantive merit. Moreover, because the sufficiency of the evidence was challenged on direct appeal, Whitfield's postconviction motion is barred as previously adjudicated under Superior Court Criminal Rule 61(i)(4).

---

* *Whitfield v. State*, 867 A.2d 168 (Del. 2004).

NOW, THEREFORE, IT IS ORDERED that the judgment of the

Superior Court is AFFIRMED.

BY THE COURT:

Chief Justice

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MUSTAFA WHITFIELD, | § | |
| | § | |
| Defendant Below-Appellant, | § | No. 327, 2005 |
| | § | |
| | § | Court Below—Superior Court |
| v. | § | of the State of Delaware, |
| | § | in and for New Castle County |
| STATE OF DELAWARE, | § | Cr. ID. 0210009174 |
| | § | |
| Plaintiff Below-Appellee. | § | |
| | § | |

Submitted: December 21, 2005
Decided: January 9, 2006

Before **STEELE**, Chief Justice, **HOLLAND**, **BERGER**, **JACOBS**, and **RIDGELY**, Justices, constituting the *court en banc*.

***ORDER***

This 9th day of January 2006, the Court having considered the appellant's Motion for Rehearing *En Banc* dated December 21, 2005, and it appearing that the motion should be denied.

NOW, THEREFORE, IT IS ORDERED that the appellant's motion be and the same hereby is,

**DENIED**.

BY THE COURT:

[signature]

Chief Justice



State of Delaware vs. **MUSTAFA A. WHITFIELD** Case: **02 10 009174**

Exhibit B

SBI Number: **00317479** Also Known As: **MUSTAFE WITFIELD**
Date of Birth/Age: **1985 (17)** Sex: **Male** Race: **Black**
Eye Color: **Brown** Hair Color: **Black** Height: **5'11"** Weight: **138 lbs**
Driver's License: Social Security Number:**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**
Address: **622 W 6TH STREET**
**622 WEST 6TH STREET**
**WILMINGTON, DE 19801**
Phone:
Employer:

Date and Times of Offense: **Between 10/14/2002 at 2352 and 10/15/2002 at 0015**
Location of Offense: **500 WILLING ST - Wilmington, 19801**

Your affiant STEPHEN MISETIC can truly state that:

1.) That this affiant is employed b ythe City of Wilmington as a police officer and has been for the past six years. This affiant is currently assigned to the Criminal Invetstigation Division.

2.) That this affiant can state that this incident occurred in the 500 Block of Willing Street, which is located in the City of Wilmington, County of New Castle, State of Delaware.

3.) That this affiant can state that on 2352 hours of 14 October 2002 while on routine patrol officers in the area of 4th and West Streets, observed three subjects running East on 5th Street then North on West Street. The subjects were described as black males. Suspect #1 was wearing a white t-shirt and dark pants. Suspect #2 was wearing a dark grey sweatshirt and dark pants. Suspect #3 was wearing all dark clothing.

4.) Your affiant can state that suspect #2 and supect #3 jumped over a fence in the 500 Block of North West Street, traveling east bound. The patrolofficers became suspicious of the subjects, as they appeared to be running with a purpose. The patrol officers decided to stop suspect #1, who was still running northbound in the 500 Block of North West Street.

5.) Your affiant can state that upon sstopping suspect #1, they observed him sweating and having trouble talking due to running. The patrol officers checked the area that the other two subjects were along with suspect #1 on the East side of North West Street. While checking this area a black in color handgun was located on the sidewalk in the 500 block.

* 6.) Your affiant can state that the other two suspects were stopped in the 200 block of West 4th Street. Patrol officers positively identified these subjects that were seen running with suspect #1.

7.) That this affiant can state that while the suspects were stopped, Wilcom dispatched another patrol vehicle to the 500 Block of Willing Street in reference to a shooting. This location is half a block from where the suspects were seen running together from, moments before the call came over the air.

8.) That this affiant can state that the victim was located and a scene was also located in the 500 Block of Willing Street. At this scene a 9mm round was located along with a 9mm shell casing. The scene was held until Evidence Detection Unit arrived and collected same. Also located at the scene was a white in color t-shirt.

Affiant

Sworn and subscribed before me this 15th day of October AD, 2002

Judge/Master/Commissioner/Court Official

State of Delaware vs. **MUSTAFA A. WHITFIELD** Case: **02 10 009174**

9.) That this affiant can state that the victim was transported to Christiana Hospital by ambulance for a gun shot wound to the left foot. The victim was seen by Doctor Dunlap, who treated him for a shattered first Metatarsal bone and a shattered first Proximal Phalanx. He was admitted for the night.

10.) Your affiant can state that the victim waas interviewed at the hospital. The victim stated that while exiting his vehicle in the 500 Block of Willing Street three subjects approached him. Suspect #1 brandished a black in color Semi-automatic Handgun. Suspect #1 was wearing a white in color t-shirt and dark pants. Suspect #2 was wearing dark clothing and a dark grey shirt, while suspect #3 was wearing dark clothing. Both of these suspect"s were donning white in color masks, possibly t-shirts, which covered their entire face, but their eyes.

11.) Your affiant can state that suspect #1 told the victim to "give it up". One of the other two suspects stated, "grab the keys". Either suspect #2 of #3 went to grab for the keys, as they did the victim grabbed this suspect. Both the victim and either suspect #2 or #3 fell back into the brush area along the east side of the street. This suspect got off the ground and suspect #1 fired a shot at the victim. This shot missed and all three suspects

ran together south in the 500 Block Of Wiilling Street. The victim then gave chase, at which point suspect #1 stopped, turned around and fired another shot at the Victim. This shot struck the victim in his left foot. The victim was ab able to observe the suspects run east on 5th Street towards West Street, until he lost sight of them. Either supect #2 or #3 told #1 to, "Shoot Him".

12.) That this affiant can state that the victim was shown a photo lineup, at which point he positively identified, Suspect #1, Akeem Coleman BMN-16 D.O.B.of -1986 as the individual who fired two shots at him.

13.) That this affiant can state that the weapon recovered in the 500 Block of North West Street was a black in color Smith and Wesson 9mm handgun which contained a total of five 9mm rounds, including one in the chamber.

14.) That this affiant can state that the other two subjects who had a white in color object covering their faces were positevely identified as Mustafa Whitfield BMN-17 D.O.B. of 985 and Emmanuel Robinson BMN-17 D.O.B. of 1985. These two subjects along with Akeem Coleman were transported to Central for further investigation.

15.) That this affiant can state that while at central a white in color t-shirt was retrieved from the property of Akeem Coleman that he was not wearing and Mustafa Whitfield was wearing a white t-shirt under a grey sweater

16.) That this affiant can truly state that all attempts to notify the guradians of the juvenile suspects. Ms. Brown, who is the mother of Emmanuel Robinson, stated that we could speak to him. Ms. Neal, who is the mother of Mustafa Whitfield, stated we could not speak to her son. With the number provided by Akeem Coleman an attempt was made to contact his guardian. A male answered the phone and stated that Akeem Coleman did not live there. This was presented to Akeem Coleman, who responded that he gave us the right number.

17.) That this affiant can state that Emmanual Robinson after being read his Miranda Rights, Mr. Robinson stated that he was walking home with Mustafa Whitfield and has no idea of a shooting, nor who Akeem Coleman.

18.) That this affiant can state that Akeem Coleman was read his Miranda Rights and stated that he was walking home to Elsemere from the east side. He does not know the other two subjects and has no idea about a shooting.

Affiant: STEPHEN MISETIC (07056) of WILMINGTON PD

Victim: [redacted]

Date of Birth

Relationship Victim to Defendant
Stranger

Affiant

Sworn and subscribed before me this 15th day of October AD, 2002

Judge/Master/Commissioner/Court Official



**Because obviously we found a gun on the ground he might be armed.**

Q. I'm going to show you what has been marked State's Exhibit 29. Could you tell the jury what that is?

A. **That's a picture of the brick wall in the 500 block of West where the two suspects jumped over the fence and the tree is approximately on the ground. Behind the tree is where the gun was on the sidewalk.**

Q. If you could use the laser and show the jury the area where you located the gun?

A. **Right about there behind that tree on the ground.**

Q. Was it on the sidewalk?

A. **Yes, it was on the sidewalk.**

Q. Now, is there anything significant about where you are standing in this picture?

A. **That is the wall, the exact area of the two, Mr. Robinson and Whitfield, jumped over the fence.**

Q. So where you are standing?

MR. BERNSTEIN: Objection. I don't think that it has been established this witness has identified anyone. He just mentioned two people by name who

jumped over the fence and I don't think that is -- he has never been asked to identify these people. I don't know where this is coming from.

THE COURT: Can you rephrase your question?

MR. DONAHUE: Yes, your Honor.

BY MR. DONAHUE: .

Q. Where you are standing, that is where the two individuals jumped over the fence?

A. **Correct.**

Q. And which direction in this picture were the individuals that jumped the fence running?

A. **That would be eastbound.**

Q. So if you could use the laser and show the direction the way they were running?

A. **Over that fence to the courtyard.**

Q. But from which direction would they enter this picture?

A. **Right where I was standing.**

Q. So from right to left; is that fair to say?

A. **Yes.**

THE COURT: Are you saying they are going behind you?

THE WITNESS: Correct. Over the fence is east

and they kept going eastbound through the courtyards.

Q. Were you able to get a good look at the two individuals that jumped over the wall?

A. **I got a look, not a great look, but good enough at the clothing description.**

Q. You didn't see their faces?

A. **No.**

Q. Now, could you -- I'm going to show you what's been marked as State's Exhibit 30. Could you please tell the jury what this is?

A. **Again, that's the eastern most sidewalk in the 500 block of West Street.**

Q. And --

A. **Looking north on west.**

Q. And can you depict the area where you located the gun?

A. **Right there in that area right there.**

Q. And where did Officer Prado stop Akeem Coleman?

A. **Probably up around there.**

Q. Now, when you located the gun, what did you do?

A. **I picked it up to make the weapon safe, which**

**is to see if it was loaded and there is a magazine in the clip -- or clip in the gun. At that point I made it safe by ejecting the one round out of the chamber and removing the clip.**

Q. So was there a round in the chamber?

A. **Yes.**

Q. And was there a magazine?

A. **Yes.**

Q. Do you know if the magazine had any bullets in it?

A. **It did.**

Q. Were you able to take a look at the bullets that were in the magazine?

A. **Yes.**

Q. And were you able to identify those bullets?

A. **Hollow point nine-millimeter rounds.**

THE COURT: Do you have the trigger lock?

THE BAILIFF: Yes, your Honor.

THE COURT: Would you like to bring it up and put it on, please?

BY MR. DONAHUE:

Q. I'm handing you State's Exhibit 14. Could you please open that envelope. Can you tell the jury what

where you were in between there and there.

Q. That's far away and I'm going to guesstimate that's maybe 30 feet?

A. **I guess so.**

Q. And at that distance are these people going over the wall?

A. **Yes.**

Q. And you are still in your car?

A. **Getting ready to get out, yes.**

Q. Getting ready to get out?

A. **Yes.**

Q. You get out of your car and you go up -- are you running up the street by now?

A. **Yeah. I ran towards where I saw them jump over.**

Q. You are running on the east side of West Street along that wall; correct?

A. **Right where I saw they jumped I went to that spot and --**

Q. When you saw these two people go over the wall how far away from them were you? Back here or closer?

A. **About that distance.**

Q. Okay.

A. **I can't be sure, they were moving.**

Q. You weren't five feet away, were you?

A. **No.**

Q. You weren't here, were you?

A. **No.**

Q. No way. And from where you were you were able to see they were black males?

A. **Yes.**

Q. Correct?

A. **Yes.**

Q. And they were wearing dark clothing?

A. **Dark. I think one had a gray sweatshirt on.**

Q. You could tell it was gray?

A. **Uh-huh.**

Q. Not black?

A. **No. Looked like a gray in color shirt.**

Q. Not dark green?

A. **No.**

Q. You are positive it was gray?

A. **Yes.**

Q. Were they wearing any head gear, caps, hats, anything like that?

A. **I don't recall. I don't think they were wearing head gear.**

Q. Could you see their faces?

A. **No, I saw them more from the back.**

Q. Their backs were towards you, right? They are not running towards you running away from you; correct?

A. **Yes.**

Q. So you get a good look at their backs, don't you?

A. **Yes.**

Q. I noticed in one of the earlier pictures there was a figure standing up against the wall; was that you?

A. **Yes.**

Q. You don't quite come over the wall?

A. **No.**

Q. You got to jump over to see the -- jump up to see over the wall?

A. **Yes.**

Q. Did do you that?

A. **Yes.**

Q. You didn't go over the wall; what did you do?

A. **I looked to see if I was close enough to see if I could pursue them on foot to catch them.**

Q. Did you have to jump up?

A. **Pull myself up.**

Q. So you are hanging?

A. **Looking enough to see over the fence and --**

Q. What do you see?

A. **Nothing. They were gone.**

Q. They are gone. Okay. Now did you call this incident in to Recom?

A. **Wilcom, yes.**

Q. Wilcom, okay. And those calls are all recorded; correct?

A. **Yes.**

Q. Does the identification 17C mean anything to you?

A. **Yes.**

Q. What was that?

A. **The call sign 17 District, Car C, Platoon Charles.**

Q. So if it is recorded that 17 C did something, that's you?

A. **Yes.**

Q. I want to show you a document that's been represented to me to be a Wilcom dispatch entry; do you

Q. Were they close enough to touch each other?

A. **It is hard to say. Distance wise you can't -- perception wise you can't tell if they were that close to touch each other, but they were in a group.**

Q. Now, you testified that two of the individuals --

A. **-- made it over the wall, correct.**

Q. And one didn't?

A. **Correct.**

Q. Did you see the one who didn't make it over attempt to get over the wall?

A. **Yes. Yes.**

Q. And he could not get over?

A. **Correct.**

David Prado questioned by the state

Q. Were you able to get a description of the two individuals who went over the wall?

A. **Being that that area is not well lit, I mean, it is dimly lit, dark clothing, they were thinner, you could tell they were a lot smaller than the one individual. But they were thin in stature and they were able to jump over this wall pretty easily without any problems.**

Q. Could you tell what race they were?

A. **No.**

Q. Now, upon seeing the individuals running, what did you and your partner do?

A. **As soon as we saw them running and that occur, we had already started through the light going into the middle of the block, 400 block of West Fourth Street. The larger individual who didn't make it over the wall proceeded to walk northbound on the 500 block of West Fifth. We exited our patrol vehicle, stopped him and asked to speak with him.**

Q. The individual you stopped in that area do you see that individual in court today?

A. **Yes. It is Mr. Coleman.**

**MR. DONAHUE: Let the record reflect the witness has identified Defendant Akeem Coleman.**

BY MR. DONAHUE:

Q. Who took the Defendant Coleman into custody?

A. **We had both got out of the vehicle. I was a passenger, I believe, that night, so I had first hands-on with him because Officer Derbyshire walked towards the direction of where the other two were spied jumping over the wall.**

Q. And what did you do when you contacted Coleman?

A. **Usually it is our normal protocol, we will bring them over to the vehicle, place hands on vehicle, just a normal stop and proceeded to ask questions.**

Q. What, if anything, did Officer Derbyshire?

A. **As he was walking down towards the last location we had seen the subjects together, he immediately found a weapon, a handgun.**

Q. And what, if you know, what did he do with that weapon?

A. **He immediately told me that he found a weapon, and as soon as we called in the stop we were advised by Wilcom, our radio room, they had just received a call for shots fired and that's -- you know, that's when Officer Derbyshire had located the weapon.**

Q. Did they broadcast the shots were fired?

A. **They were given the -- I can't recall exactly if it was -- it was the 500 Block of Willing Street, but I don't exactly recall.**

Q. Is the 500 block of Willing in New Castle County State of Delaware?

A. **Yes.**

Q. Now, after -- strike that.

What did you and Derbyshire do with Defendant Coleman?

A. **We detained him immediately. Placed handcuffs on him immediately and placed him in the patrol vehicle. And I think at that time that's when we made the weapon safe. And from that point that's where I went to backtrack to see if we could locate the two other individuals.**

Q. Where did you backtrack?

A. **Went back to the same location that Derbyshire had found the weapon. I jumped over the brick wall** to -- about six feet, jumped over that, went in the courtyard of St. Peter's cathedral.

Q. What did you do then?

A. **Went through the courtyard of St. Peter's Cathedral and checked some of the darker areas. There is a chain link fence in the back of St. Peter's Cathedral, a six-foot tall chain link fence went throughout the courtyard, was in between the school and church, went through that courtyard and then came out on Sixth Street, jumped over a smaller brick wall onto Sixth Street between the church and school.**

Q. And once you were onto Sixth Street which

them?

A. **Fourth and West which is about a block and a half.**

Q. Were you on Fourth Street or facing north on West?

A. **North on West facing Fourth Street.**

Q. Waiting for the light to change?

A. **Yes.**

Q. So did you see these guys where they came out of?

A. **They were coming east on Fifth Street so you can't tell where they are coming from because there is a church there and fence but they were coming.**

Q. Did it appear they observed you?

A. **No. I don't think they observed us it didn't seem like they saw us.**

Q. Who was driving that night?

A. **I'm sure I was a passenger that night because when we got out of the vehicle I was the first one that approached Mr. Robinson -- Mr. Coleman.**

Q. So you believe you were the passenger that night?

A. **Correct.**

Q. And Derbyshire would have been driving?

A. **Correct.**

Q. When you saw these guys running did they mash down and accelerate?

A. **No. Because when we saw them running that's when we went through the light. They were at high speed, high tailing it, and it was around the middle of the block was when they were already jumping over the wall. So we didn't speed up or anything because Coleman began to walk, so we were just going to stop them so there was no need to really high tail it.**

Q. Let me see if I can follow this then. You are at Fourth and West?

A. **Correct.**

Q. And so you have got the light in front of you and four lane Fourth Street ahead of you; correct?

A. **Correct.**

Q. You have to go in the 400 block of West Street and you have Friends Meeting House and a little cemetery there on the your left?

A. **Yes.**

Q. And go across Fifth Street and 500 block of West Street now and it is about halfway up between Fifth and Six that the two individuals who went over the wall went over the wall; is that correct?

A. **No. They -- where they jumped over the wall, it is I would say maybe 15 feet away from the front door of the rectory. St. Peter's Cathedral rectory is where they jumped over the wall.**

Q. For purposes is that fully up the block, halfway, three quarters?

A. **No. The rectory is at the corner of Fifth and West.**

Q. So it is closer to Fifth Street than Sixth Street where they went over the wall?

A. **Correct.**

Q. And when they are going over the wall, approximately where is your vehicle?

A. **We are already into the intersection going in to the 400 block of West is when they are jumping over the wall.**

Q. Going 20 to 25 miles per hour?

A. **I can't tell. Normal speed. Again, we weren't speeding to the location.**

Q. So you are better than a block away and they are already going over the wall?

A. **Correct.**

Q. Could you see them clearly from that distance?

A. **Only thing you could see was they were taller, one was larger than the other two, but it was dark clothing so you couldn't tell facial wise or who it was, it was dark clothing.**

Q. You indicated two of them got over and the larger one tried to get over but couldn't get over?

A. **Correct.**

Q. Are you sure about that?

A. **Yes.**

Q. Because your partner testified that you didn't necessarily see anybody try -- the third person try to go over the wall?

A. **That's what I saw. I was on the passenger seat so I have the better view of what was going on. We both saw them running, but I had the better view of what they were doing because he was of course driving. But that's --**

Q. Then that individual just continued walking up the block?

A. **Yes. Started walking north on West Street.**

Q. When he is walking north on West Street did

individuals have what he described at the time is a white type mask wrapped around their heads, the third individual didn't have a mask, the third individual had a firearm. That individual went up to Anthony Meeks as he exited his car and said: "Give up the keys. Give up the keys."

The other two individuals walked around the side of him to essentially block Anthony Meeks in where his car was. As I said, the individual with the gun didn't have a mask on. Anthony Meeks is going to tell you that the individual with the gun is this defendant, Akeem Coleman. He identified him that day and the State anticipates he will identify him in court for you.

There were two other individuals with him. As I said, they had these type things wrapped around their heads. "Give up the keys. Give up the keys." He has his keys in his hand. So another defendant -- and the State suggests the evidence will at least substantially show that that defendant is Mustafa Whitfield with the reddish type sweatshirt on, is standing there. And the evidence will also show that Emmanuel Robinson, the defendant in the back row, grabbed the keys in Anthony

Meeks' hand. Anthony Meeks, trying to defend himself, or the evidence will suggest that, grabbed him around the neck and he started to struggle. As he is struggling with him, Akeem Coleman is still, "Give" up the keys. Give up the keys" pointing the gun. He struggles with him and falls back.

You will see a photograph where his car is parked, there is short curb with ivy and a fence. He is going to tell you he fell back into that and tripped. The evidence will show that Emmanuel Robinson fell on top of him. At that point bam, a shot is fired out of the gun held by Akeem Coleman.

Mustafa Whitfield and Robinson get up and start running southbound on Willing Street. Anthony Meeks is pretty angry, he is going to tell you that. He decides to follow them. He starts chasing them down Willing Street towards West Street. As he is chasing them he is going to tell you Akeem Coleman turned around and shot another shot at him. When he fired another shot he felt pain in his foot. The evidence will show he got shot in the foot. He stopped running, went back up to his mother's house where he lived, told his mother where he what happened and 911 was called.

Fortuitously, about the same time patrolman Prado and Derbyshire were on patrol in the City of Wilmington. They were at the intersection of Washington -- sorry West Street and Fourth, just a block down here, Willing is down here.

What the defendants did, what the evidence will show, is took a left-hand turn out of Willing Street towards West, running together. When they got to West they crossed the street and started going up the sidewalk. Derbyshire and Prado will tell you two of the defendants, Mustafa Whitfield and Emmanuel Robinson jumped a brick wall that surrounds St. Peter's Roman Catholic church here.

Akeem Coleman continued to run straight up the street. You will see the wall is pretty high and of the three codefendants Akeem Coleman is the biggest guy, he would have had trouble getting over the wall probably. The police stopped Akeem Coleman. They had also pursued Whitfield and Robinson because now they are trespassing on church property, almost midnight on a Friday night. As they are talking to Akeem Coleman they realize there is a firearm on the ground by a tree where these guys were walking. You will hear

ballistics testimony that that firearm fired a shell casing which was found right in the middle of Willing Street, essentially in the area of where Anthony Meeks says he was shot at the second time.

Akeem Coleman is taken into custody here. Patrolman Prado ends up going over the wall, coming back out on Sixth Street, looks south on Tatnall and sees Whitfield and Robinson, the other two defendants, together down that way. He recognizes them as the same two guys who had jumped over the wall at the church. He confronts them or they actually catch up to him at an apartment complex in the 200-block of Fifth Street and they stopped.

At that point Emmanuel Robinson has no shirt on. He is not wearing any shirt at all. He is sweating, heart beating, he is excited. Mustafa Whitfield is in the same type of physical condition. It is 46, 45 degrees outside and they were walking.

The evidence will show that a T-shirt, after the struggle with Anthony Meeks, was left by his car. You will see a photograph, there is a white T-shirt left there which is what is wrapped around this guy's head. You will hear testimony from a forensic

likely likly

south. This street has parking available on both sides, east and west of it. The victim had just parked his vehicle when he noticed three subjects traveling in a southerly direction towards him on Willing Street. Two of the subjects, Emmanuel Robinson and Mustafa Whitfield placed white in colored t-shirts over their face in attempt to obscure their identity, by only allowing their eyes to be seen. The third suspect, Akeem Coleman pointed a black in color semi-automatic handgun to the head of the victim and stated, "Give it up". Either Emmanuel Robinson or Mustafa Whitfield stated, "Grab the Keys", while the other one grabbed the hand and some of the keys of the victim. A struggle then ensued, in which the victim wrapped his arms around the suspect who had a hold of his hand and keys. The victim used the suspect he had a hold of as shield from Akeem Coleman, who was moving the handgun around in an attempt to get a clear path to shoot him. The suspect who stated, "Grab the keys" told Akeem Coleman to, "Shoot him". While moving around with the suspect the victim and the suspect fell backwards over a curb. The suspect either Emmanuel Robinson or Mustafa Whitfield was able to free themselves. As the victim was attempting to get up off the ground, Akeem Coleman fired a shot at the victim. After firing this shot all three subjects, Akeem Coleman, Mustafa Whitfield and Emmanuel Robinson started to run together, south on Willing Street towards 5th Street. The victim was able to get up and began to run after the suspects. While running towards the suspects, Akeem Coleman turned around, stopped and fired another shot at the victim. The suspects then continued to run south on Willing Street then East on 5th Street towards West Street out of sight. The victim is unsure which shot struck his foot, but after the second shot he limped over to the alley way [redacted] [redacted] The victim eventually made it inside and told his mother that he had been shot and for her to call the police, which she did.

The three suspects were seen running together away from the shooting scene by Patrolman Mathew Derbyshire and Patrolman David Prado. They were seen running together Eastbound on 5th Street then North in the 500 Block of West Street. Two of the suspects were observed attempting and eventually jumping over a fence onto the property of 500 West Street (Saint Peter's Cathedral). This raised the suspicion of the patrol officers as the subjects were running together and two of the suspects, Emmanuel Robinson and Mustafa Whitfield jumped over a fence onto private property (Trespassing). The patrol officers began to travel north on West Street towards the suspects. The third suspect, Akeem Coleman continued to run north on West Street until he was stopped by Patrolman Derbyshire and Prado. Akeem Coleman was wearing a white t-shirt and dark pants. While speaking to Akeem Coleman, Patrolman Derbyshire observed a black in color handgun lying on the eastern side of the street on the sidewalk in the 500 block of West Street, where the suspects were seen running and jumping over the fence. Akeem Coleman was placed into custody and transported to central for further investigation. During this stop a call came over main dispatch Channel 'A' stating that there was a shooting in the 500 Block of Willing Street. This location is less then half a block away from where the suspects were seen running from and the black in color handgun was located.

Patrolman Prado hopped the wall where the other two suspects were last observed and headed east towards Tatnall Street. The other two subjects were located walking east bound on 5th Street from Tatnall Street, which is consistent with the direction they were last seen running from. Patrolman Prado and Patrolman William Draper observed the two

suspects walk into the apartment complex located in the 200 block of 4th and 5th Streets. * These two suspects were stopped and positively identified as the two suspects who were seen running with Akeem Coleman and observed jumping over the fence. The suspects were identified as Emmanuel Robinson and Mustafa Whitfield. Although it was cold this night somewhere between 40 to 45 degrees, Emmanuel Robinson was bare-chested and was carrying his shirts. Both subjects were also noticeably sweating and had an accelerated heart rate for just walking. These suspects were taken into custody and transported to central for further investigation.

The victim was transported to Christiana Hospital for a single gunshot wound to his left foot. While at the hospital the victim was treated by Doctor Denise Dunlop for a possible fracture. Through the x-rays it showed the victim suffered a shattered 1st Metatarsal Bone and a shattered 1st Proximal Phalanx. It is unknown at this time if there will be any future problems with walking or running, although according to Doctor Dunlop the victim could have certain limitations from the injury. This detective along with Detective James Diana responded to the Christiana Hospital and conducted an initial interview of the victim. During this interview the victim was shown two separate photo lineups. One lineup contained a photo of suspect, Emmanuel Robinson and the other contained a photo of Akeem Coleman. The victim was unable to identify a photo of Emmanuel Robinson as one of the suspects involved in the incident as he was unable to see his face due to the white in color clothing around his face. When shown the second lineup, the victim positively identified Akeem Coleman as the person who displayed the black in color handgun and fired both shots at him. This detective along with Detective James Diana then responded to the crime scene, 500 block of Willing Street and noted the lighting conditions along with any vehicles in the block.

This detective along with Detective James Diana received permission from Eugene Robinson mother to interview her son. An interview was conducted. An attempt was made by Detective James Diana to contact the mother of Akeem Coleman with the number Mr. Coleman supplied. This attempt was met with negative results, so an interview was conducted with Mr. Coleman. Detective James Diana contacted the mother of Mustafa Whitfield, who stated that she did not want her son interviewed and no interview was conducted.

An area canvas search was conducted by patrol officers, who responded to the area. During this canvas search several individuals were located that heard shots fired in the area. One witness was located who heard a commotion in the 500 block of Willing Street. This witness looked out his window and observed a heavy set male holding a black in color handgun towards another male. He then observed this heavy set male fire a shot at the male. The male with the gun and two other subjects began to run towards 5th Street, while the victim ran after them. The heavy set male then turned around and fired two more shots at the victim, who then started limping.

The three suspects were booked on the below listed charges and arraigned at Justice of the Peace Court #20. They were all committed to New Castle County Detention Center. Due to several other robberies and carjackings in the surrounding area, search warrants for the addresses of the suspect's were executed for possible evidence related to these robberies and carjackings. During the search warrant at Mustafa Whitfield's residence, 622 West 6th Street Wilmington, Delaware, Detective Brian Ellis located crack/cocaine and heroin in Mustafa's jacket, which was located in his bedroom. This

(page 13) Facts Included as facts

page 3 (three)

**PROBABLE CAUSE**

1.Your affiant is Detective Stephen Misetic, a police officer with the Wilmington Department of Police who has served in this capacity since September 30th, 1996. Your affiant is currently assigned to the Criminal Investigation Division and has been since April 16th, 2002.

2. Your affiant can truly state that on 14 October 2002 Wilmington Police were on routine patrol in the area of 4th and West Streets in the City of Wilmington. At approximately 2352 hours they observed three black males running together East on West 5th Street then north on West Street. Two subjects scaled a fence on the east side of the street. At the time the patrol officers were able to stop the one subject who did not jump over the fence, as the others continued through the fenced in property. At the location where they stopped the one subject, in the 500 Block of Willing Street the officers located a loaded 9mm handgun this was also within close proximity of where the subjects were seen jumping over the fence. The other two subjects, who were seen jumping over the fence were stopped in the 200 block of West 4th and West 5th Street.

3. Your affiant can truly state that simultaneous to the stop of the first subject, Wilmington Police Communications dispatched units to the 500 block of Willing Street in reference to a shooting. This location is approximately half a block away from where the subject was stopped and was the location where all three subjects were seen running away from together. At the scene a 9mm casing was located as well as a white t-shirt, which was located where the victim and one of the suspects were involved in a struggle and fell backwards. There were no other subjects observed in the area by the patrol officers. Through interviews with the victim, who was shot in the left foot, the three subjects approached him and attempted to carjack him. The victim described the shooter as a black male wearing a white t-shirt and described the other two subjects as black males who had their faces covered with white t-shirts except their eyes. He added that one of these subjects was wearing a dark gray shirt and the other was wearing a dark or black colored shirt.

4. Your affiant can truly state that due to the suspicious actions of the three subjects along with the close proximity of the shooting scene as well as a 9mm handgun to them, the three subjects were brought to the police station for further investigation. While at the police station, their photo lineups were completed with two of subject's pictures and shown to the victim. The victim positively identified **Akeem Coleman BMN-16 D.O.B. 1986** as the subject who displayed a handgun and shot him. **Mr. Akeem Coleman BMN-16 D.O.B -1986** was the initial person who was stopped by the patrol officers.

5. Your affiant can truly state that due to the suspicious actions of the other two subjects, **Mustafa Whitfield D.O.B. BMN-17 1985** and **Emmanuel Robinson BMN-17 D.O.B. 985**, and the fact they were seen running together with the identified shooter, **Akeem Coleman BMN-16 D.O.B. 1986**, seconds after the shooting, it is believed that they are the other two suspects involved in the this incident. Furthermore, your affiant can state that upon being stopped, **Mustafa Whitfield BMN-17 D.O.B. 1986** was wearing a dark gray sweater with a white t-shirt under it and **Emmanuel Robinson BMN-17 D.O.B. 1985** was wearing a black shirt.

A49 Yeah, yeah.

Q50 Everything was the same?

A50 Yeah.

Q51 Okay um how about what their clothing?

A51 Uh they had the white tee shirt uh whatever that was over their face and it was like uh a matching outfit like gray or dark black or charcoal uh…

Q52 Okay.

A52 Like a shirt in their pants like a uh was it uh like a I'm trying to think of that (CU) military might wear. Like you might go to the store and get you know like a matching, a whole outfit.

Q53 Okay.

A53 Like that but it was just that same color (CU) outfit.

Q54 Both of them had on the same or…?

A54 Yeah seemed it seemed to be (CU)

Q55 Okay.

A55 (CU)

Q56 ~~Okay, alright~~ uh I know you said that some of them uh made some statements um actually let ~~me go back.~~ When when they start walking towards you you said one of them uh one of the guys with the mask um you said he snuck he was coming around?

A56 He tried to yeah that was this was like right when they came around the corner and I guess they saw me look up at them, cause I looked dead at them and he looked like he tried to duck down. But then like he was trying to duck and come around behind me then then he stopped, then they both all three of them came around from uh towards the driver's side.

Q57 When you now when you came down um you came off of 6th down Willing.

A57 Right.

Q58 So so you're heading South bound at that point?

O'Connor is wearing?

A. **Gray, dark gray.**

Q. You are familiar with the lighting conditions where you park your car at night on Willing Street?

A. **Pretty much.**

Q. Given those conditions, whether it is bright as daylight or dark or whatever they are, under those lighting conditions were you able to distinguish colors or how well or how poorly were you able to distinguish colors?

A. **At that time colors were not on my mind.**

Q. Were you asked to describe the color of the gun? What did you say?

A. **Told them it was black.**

Q. You remembered it was a gun?

A. **I remember the gun, yeah.**

Q. And you are sure it was black?

A. **Yes.**

Q. Not gray, not dark blue, black?

A. **It was black.**

Q. When you were asked at the hospital to describe the clothing, do you remember what you said?

A. **No. I don't remember what I said.**

Q. Would you like to look at something maybe to refresh your memory?

A. **Sure. Why not.**

Q. Do you remember telling the police officer who interviewed you at the hospital that you described the two other suspects as wearing matching dark clothing, possibly a dark gray shirt with white scarves around their faces; do you remember saying that?

A. **That's what I said then?**

Q. At the hospital.

A. **That's what I said, that's what was said.**

Q. You don't have a recollection sitting here today that you said that?

A. **I remember saying that they looked like twins, that I remember.**

Q. When you say twins in terms of the way they were dressed?

A. **Dress and the build and the size of them in the way they were dressed.**

Q. Kind of the same build and they were dressed kind of the same?

A. **Yes.**

Q. You said they both had white scarves covering

their faces?

A. **T-shirts, scarves covering their face.**

Q. Clothing pants, light or dark?

A. **It wasn't white.**

Q. Dark, not khakis?

A. **No.**

Q. How about shirts? Could you distinguish colors? Because apparently the person who recorded your interview recorded that you said possibly a dark gray shirt.

A. **That's what was written.**

Q. Let me ask you this, do you think if you were standing on Willing Street at night right now you could distinguish somebody wearing a dark gray shirt or a black shirt?

A. **I don't know. They would have to be out there.**

Q. You have been out there many many times?

A. **When you're on Willing Street or any street you don't think about person's colors, you think about your position, who are they, where are they, if they are trying to do something or not. You are not thinking about if the guy has rainbow socks on, that**

**doesn't come to mind.**

Q. I'm not asking that if you could distinguish between colors?

A. **It is possible.**

Q. I'm not saying whether you did or didn't that night, but if you were to go out there tonight and look at people wearing clothing could you tell whether someone was wearing a dark gray shirt or dark green shirt?

A. **It is possible.**

Q. Or a dark gray shirt or black black shirt or dark blue shirt?

A. **It is possible.**

Q. Do you think your vision is better today than it was 18 months ago or about the same?

A. **About the same. About the same.**

Q. Did you notice anything unusual about any of the clothing worn by any of these three people that you saw?

A. **Unusual as in what?**

Q. Say if one of them was wearing a top hat a foot tall, would you have remembered that?

A. **Something abstract like that, yes.**

see that? Do you recognize that document?
A. **Yes.**
Q. Look at the bottom three lines where it says 17C, do you see that?
A. **Yes.**
Q. What does it say?
A. **17C had one stopped, two fled, jumped over the fence by church, suspect male, gray black sweatshirt jumped over the fence towards Orange Street.**
Q. Is there a time recorded there?
A. **23:59.**
Q. What is the time next to the 17C?
A. **00:06.**
Q. What time would that be?
A. **12:06.**
Q. Six minutes after midnight?
A. **Correct.**
Q. Earlier you mentioned two individuals, Mr. Whitfield and Rob --
A. **Robinson.**
Q. -- Robinson by name?
A. **Correct.**
Q. You didn't know anybody's name at three

minutes after 12?
A. **At that time?**
Q. You didn't know anybody's name except that they were black males?
A. **Yes.**
Q. Were you personally involved in the apprehension of Robinson and Coleman?
A. **No.**
Q. You were not?
A. **No.**
Q. Did you ever see those two people again that night?
A. **No.**
Q. Did you ever see them the next day?
A. **Next day, no.**
Q. Do you know who was involved in arresting those two people and apprehending them?
A. **I believe Officer Prado and Officer Draper.**
Q. Okay. But you were not?
A. **No.**
Q. Did you have any involvement with this incident after you apprehended Mr. Coleman and picked up this weapon?

**Other than that I went back to -- transported them back to Central for booking purposes.**
Q. You mean you transported Coleman?
A. **Coleman. Coleman, correct. Then I wrote the incident, whatever we had done that night and our actions.**
Q. That was it?
A. **Yes.**
Q. Other than going back a couple months later taking some photos or you don't remember that?
A. **I remember taking a photo yesterday.**
Q. All right.
MR. BERNSTEIN: Excuse me for a minute.
That's all, your Honor. Thank you.
THE COURT: Anything further?
MR. DONAHUE: Very brief.
BY MR. DONAHUE:
Q. Officer, is it possible that Akeem Coleman dropped the gun and you didn't see it?
MR. O'CONNELL: Objection. Calls for speculation. The question was phrased is it possible.
MR. DONAHUE: I will rephrase.
BY MR. DONAHUE:

Q. From your position would you have been able to see Akeem Coleman drop a gun?
A. **No.**
Q. I didn't say that.
A. **If he had it down by his side cars would be blocking my view, trees there.**
Q. Which cars?
A. **The ones parked on the -- like in the picture east side of the block.**
MR. DONAHUE: No further questions.
MR. O'CONNELL: Nothing further.
MR. BAYARD: Nothing further.
MR. BERNSTEIN: Nothing further, your Honor.
THE COURT: Very well. You may step down.
State's next witness please.
MR. O'CONNOR: State calls Francisco Failey, somewhat out of order. But Francisco Failey.
FRANCISCO FAILEY,
the witness herein, having first been duly sworn on oath, was examined and testified as follows:
BY MR. O'CONNOR:
Q. Mr. Failey, where do you live?
A. **515 West Street, Wilmington.**