In The United States District Court
For The District Of Delaware

Mustafa A. Whitfield
  Petitioner
     v.                                   Civ. Act. No. 06-137-GMS
Thomas Carroll Warden and Carl C. Danberg Attorney General for the State of Delaware
                                                                    Respondents

Dear Judge Gregory M. Sleet (GMS):

I would like to amend my complaint to add the following exhibits to my complaint. I am asking for this because the day after I mailed my response I received some more information and I would like to add it to my argument. It will be under Included As Facts.

                                              Mustafa A. Whitfield

FILED
JAN 23 2007
U.S. DISTRICT COURT
DISTRICT OF DELAWARE



1.

Table of Contents                                          06-137

Exhibit D²: Detective Misetic claiming Officer David Prado orally identified me.

Exhibit E: David Prado's report in which he says nothing about identifying me.

Exhibit F: David Prado's testimony about not seeing the suspects faces and seeing them from a distance.

Exhibit G: David Prado couldn't give a description of the suspects when asked for a description. Also the black male in a grey sweatsuit which is on Exhibit H at 12:06 am

Exhibit H: First computer printout.

FILED
JAN 23 2007
U.S. DISTRICT COURT
DISTRICT OF DELAWARE
BD scanned

2. Included As Facts

In Exhibit D² Misetic claims that officer David Prado "orally informed" him that when I was stopped I was breathing heavily and I was sweating, and I matched a description of the suspects.

First I want to say I wasn't sweating in 40 degree weather 160 pounds with a sweater on. Prado never said we or I was breathing heavily, he said their hearts were racing. My heart was racing because I had about 8 cops with guns out telling me "get the hell on the ground." (See heart racing Exhibit F)

How could Prado positively identify me as a suspect because I was "sweating and breathing heavily" after the fact. In order to positively identify someone you have to say, that's the person I saw because it's him/her. Misetic is claiming Prado "orally informed" him I was who he saw because I was "sweating and breathing heavily" when I was stopped. Obviously Misetic isn't telling the truth because that isn't a identification, anybody could say "well I stopped him/her and he/she was breathing heavily so its him." A positive identification is "I'm sure this is the person", not "well I stopped this person and he/she was sweating."

Prado's report doesn't say anything about him identifying me. If he "orally informed" Misetic that he saw me, then why didn't Misetic tell him to put it in his report. Prado testified that he and Derbyshire were over a block away when two of the suspects jumped over the fence, he couldn't tell the suspects races, facial wise

3

who it was and it was dark clothing. And the street was dimly lit, so how or why would he tell Misetic that he saw me and I fit the description. Obviously in the photo's from my arrest all my clothing wasn't dark. In Exhibit F Prado gives that description. He and Derbyshire were over a block away, if Prado really identified me why didn't Misetic say anything. Meaning if Prado identified me as a suspect why didn't Misetic say something when Prado testified he couldn't tell the suspects faces.

Exhibit G when asked for a description Prado said "We saw from a distance....". If Prado couldn't give a description than how could he describe after I was stopped that I fit this description? The transcript actually complies with Prado's we were over a block away testimony because he said we saw from a distance.

Misetic is white washing things. Prado did identify me as one of the people he stopped, but he didn't identify me as one of the suspects he saw fleeing from the crime. There is a big difference between that's the guy I saw running and that's the guy I stopped. If that is the case everytime someone is stopped he only has to be identified as the person stopped.

Misetic is claiming that I fit the description. What description would that be? The all grey sweatsuit, niether I nor Robinson had this on (See Exhibit G) I have reason to believe that that was actually placed on that dispatch tape after I wasn't identified by the officers. You see Exhibit G wasn't given to me during the discovery, that tape was played days

4.

trial and transcribed. That description on Exhibit G which is said between 23:54 and 23:58 is on Exhibit H at around 00:06. So Exhibit G which was transcribed during trial has it between 11:54 p.m and 11:58 and the paraphrased version has it about 12:06 a.m. The same descriptions at two different times, and Exhibit H was taken off the computer back in 2002. for some reason the date is messed up.

But that description that Misetic claims Prado was relying on, according to the printout was said at 12:06 am on October 15, 2002 yet at trial it's said about 10 minutes before. According to dispatch transcript Exhibit G I was stopped at 11:58 p.m. And if you look at the times at 11:58 on Exhibit H you have the caller saying the victim is outside of 514 Washington Street (its blanked out but I had another copy and that what it said) and Exhibit G has has the victim outside of Washington (514 Washington Street) Exhibit H is a caller and Exhibit G is relating what the caller was telling the 911 operator and the dispatcher related that to the officers in the field. The times are the same.

That description came over at 12:06 a.m, I was stopped at 11:58 p.m somehow that description during my trial is placed before I was stopped, it doesn't matter because I didn't have on a all grey sweatsuit anyway, but there is more evidence that shows that they are hiding something.

So Prado didn't identify me as a suspect because he didn't see the suspect's faces, races and dark clothing and they were

5.

at distance. There was no way he could have said I was one of the suspects he saw fleeing. Again he did identify me as one of the people he stopped. I didn't fit no description because they didn't have one until after I was stopped. 11:58 p.m. I was stopped 12:06 am that description came over the radio but somehow it was placed before I was stopped.

But similar isn't a positive identification anyway a all grey sweatsuit who had that on the suspect, I didn't.

Misetic didn't say Rado identified me as the person he stopped he said Rado identified me as the suspect he saw fleeing which is impossible because he couldn't see anything according to him.

I would also like to note something else in Exhibit D²: Detective Misetic says that he nor Rado noticed the Pepe Lepieu on my sweatshirt (I had on a sweater which was light grey) when I was stopped. ① Misetic was not there when I was stopped ② his justification for not mentioning it in reports is because he didn't see it but he took a photo of me in it, and the Pepe Lepieu is covering the whole chest area you can't miss it and ③ if you read between the lines he's insinuating that maybe I didn't have this light grey sweater on when I was stopped, because no one saw it, well than how could I fit this description because than I would have only had on a white T-shirt and blue pants when I was stopped. One second you say I fit the description, the next you say when I was stopped you don't know what I was wearing.

Mustafa Whitfield

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MUSTAFA A. WHITFIELD,                :
                                     :
        Plaintiff,                   :
                                     :
v.                                   :   C.A. No. 06-541 GMS
                                     :
WILMINGTON POLICE DEPARTMENT,        :
                                     :
        Defendant.                   :

### AFFIDAVIT OF STEPHEN MISETIC

STATE OF DELAWARE    :
                     : S.S.
NEW CASTLE COUNTY    :

I, STEPHEN MISETIC, being duly sworn according to law, depose and state that the information contained herein is based upon my personal knowledge and is true and accurate.

1. I am submitting this affidavit in support of Defendant Wilmington Police Department's Motion to Dismiss, or in the Alternative, for Summary Judgment in the above-captioned case.

2. I have been employed as a police officer with the City of Wilmington Police Department for approximately ten years, and I currently have the rank of Sergeant. At the time of Plaintiff Mustafa Whitfield's arrest in October 2002, I was working as a Detective in the Wilmington Police Department's Criminal Investigation Division.

3. On October 15, 2002, at approximately 12:30 a.m., I was notified of a shooting that occurred in the 500 block of Willing Street in Wilmington, Delaware. I was assigned to investigate this incident and prepared several reports documenting the investigatory actions I undertook and setting forth the findings of my investigation. The documents attached hereto as Exhibit "A" are true

000262

and correct copies of the investigatory reports that I prepared with respect to this incident.

4. At approximately 2:30 a.m. on October 15, 2002, I conducted a preliminary interview of the victim at Christiana Hospital. This interview was not recorded or transcribed. However, I did take handwritten notes regarding this interview. Attached hereto as Exhibit "B" is a true and correct copy of the handwritten notes I took during my October 15, 2002 interview of the victim. During that interview, the victim described the two suspects other than the shooter as wearing matching dark clothing, possibly a dark gray shirt, with white scarves or t-shirts around their faces covering everything except for their eyes.

5. On October 15, 2002, following my interview with the victim, I applied for and obtained a warrant to arrest Mustafa Whitfield. A true and correct copy of the arrest warrant application relating to Mr. Whitfield is attached hereto as Exhibit "C". The descriptions of the suspects I included in my arrest warrant affidavit were based on a combination of the descriptions given by the Wilmington police officers who stopped the shooter and witnessed the other two suspects flee over a fence, as well as the description given by the victim during his October 15, 2002 interview at the hospital.

6. I indicated in the warrant affidavit that the "two subjects who had a white in color object covering their faces were positevely [sic] identified as Mustafa Whitfield BMN-17 D.O.B. of 5-10-1985 and Emmanuel Robinson BMN-17 D.O.B. of 3-12-1985." I obtained this information from one of the arresting officers, Patrolman David Prado, who orally informed me that when he stopped Whitfield and Robinson, he was able to identify them as the suspects he had previously seen fleeing over a wall because they were breathing heavily and were sweating even though it was only around 40 degrees outside, and they matched the description of the two suspects who had climbed over the wall.

000263

7. A few hours after the incident, I took photographs of Whitfield and the other two suspects after they were taken into custody. At the time he was photographed, a large image of Pepe Le Pieu could be seen on the grey sweatshirt Mr. Whitfield was wearing. However, neither I nor the arresting officers saw this image of Pepe Le Pieu on the grey sweatshirt Whitfield had on when he was stopped and taken into custody.

8. Mr. Whitfield was charged and subsequently arrested on October 16, 2002. A few days later, on October 18, 2002, at approximately 11:42 a.m., I conducted a formal interview of the victim at the Wilmington Police Department's Criminal Investigation Division. This interview was recorded by both audio and video tapes and was subsequently transcribed. The victim's description of the suspect that is quoted in the Plaintiff's Complaint in this action is taken from the transcript of the October 18, 2002 interview of the victim. Attached hereto as Exhibit "D" is a true and correct copy of the relevant pages of the transcript of the October 18, 2002 interview of the victim, in which the victim gave a description of the two suspects other than the gunman.

_____
Stephen Misetic

SWORN TO AND SUBSCRIBED before me this 5th day of January, 2007.

_____
Notary Public

DONNA L. KELLAM
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires Sept 3, 2010

000264

Supplemental Report - #4

Exhibit E

| Original Occurrence Dates and Times: | Grid | Sector |
|---|---|---|
| MON 10/14/2002 2352 thru TUE 10/15/2002 0015 | 222-222 | 16 |

Location:
WILLING ST    Wilmington, DE 19801
EAST SIDE OF THE BLOCK

## Original Victim Information

| Victim Number | Name |
|---|---|
| 001 | MEEK, ANTHONY |

| Type | Sex | Race | Ethnic Origin | Age | D.O.B. |
|---|---|---|---|---|---|
| Individual | Male | Black | | | |

Address: [redacted]    Employer/School:    Work Telephone:

Reporting Person? ☐Yes ☒No    Victim Injured? ☒Yes ☐No    Victim Deceased? ☐Yes ☒No    Officer Comments:

## Original Suspect/Defendant Information

| Sequence | Type | SBI Number | Name | Nick Name |
|---|---|---|---|---|
| 001 | Suspect | | COLEMAN, AKEEM | |

| Sex | Race | Ethnic Origin | Age | D.O.B. | Height | Weight | Skin Tone | Eye Color |
|---|---|---|---|---|---|---|---|---|
| Male | Black | Non-Hispanic | 16 | 02/17/1986 | | | | |

Address: 1118 RODMAN RD, Wilmington, DE 19805    Home Telephone: (302) 658-4412

## Original Crime and Associated Information

| Victim Number | Crime Seq | Statute | Crime Description |
|---|---|---|---|
| 001 | 001 | DE:11:0613:00A4:F:C | Assault First Degree Intentional Reckless Serious Injury During Commission Fel |

| Location Type | Status | Involvement | General Offense |
|---|---|---|---|
| Highway/Roadway/Alley | Pending-Active | ☐Alcohol ☐Drugs ☐Computer | |

Suspected Hate/Bias: ☒No-N/A    Crime Code: 13234A - Aggravated Assault/Non-Family Firearm
Force Involved: ☐Yes ☐No    Weapon/Force Used: Automatic Handgun

### Investigative Narrative

17C PRADO AFTER STOPPING AKEEM COLEMAN IN THE 500 BLOCK OF WEST ST. OFFICER DERBYSHIRE RECOVERED SMITH & WESSON 9MM HANDGUN ON THE SAME SIDE OF THE STREET. THIS WRITER PLACED AKEEM COLEMAN INTO CUSTODY AND PLACED HIM INTO OUR PATROL VEHICLE. THIS WRITER WENT ON FOOT TO LOCATE THE OTHER TWO MALES WE OBSERVED RUNNING WITH COLEMAN, WHO JUMPED OVER THE ST. PETERS CATHEDRAL WALL, INTO THEIR COURTYARD OUT OF SIGHT. THIS WRITER JUMPED OVER THE SAME WALL ON THE EAST SIDE OF THE 500 BLOCK OF WEST ST. THIS OFFICER WALK THROUGHOUT THE COURTYARD LOOKING FOR ANY EVIDENCE WHICH MAY HAVE BEEN LEFT BEHIND BY THE OTHER RUNNING SUSPECTS. THIS WRITER DID NOT FIND ANY EVIDENCE IN THE COURTYARD. HIS WRITER THEN JUMPED OVER THE WALL WHICH IS CLOSET TO THE CHURCH ON THE 300 BLOCK OF W. 6TH ST., I THEN WALKED EAST BOUND ON W. 6TH ST.

THEN SOUTH BOUND ON TATNALL ST. AS THIS WRITER REACHED 5TH AND TATNALL I OBSERVED TWO BLACK MALES WALKING EAST BOUND ON 5TH ST. BOTH SUBJECTS DID NOT SEE THIS WRITER, THEY THEN BOTH ENTERED THE APARTMENT COMPLEX LOCATED IN THE 200 BLOCK OF 4TH AND 5TH ST. THIS WRITER WITH OFFICER DRAPER STOPPED BOTH SUSPECTS INSIDE OF HE COURT COMPLEX. IT SHOULD BE KNOWN, THAT BOTH SUSPECTS WERE SWEATING AND THEIR HEARTS WERE RACING. SUSPECT (EMMANUEL ROBINSON) WAS BARE CHESTED AND HAD BEEN CARRYING HIS SHIRTS. IT SHOULD BE KNOWN, THAT THE WEATHER WAS APPROXIMATELY 40 DEGREES THIS NIGHT. BOTH SUSPECTS EMMANUEL ROBINSON AND MUSTAFA WHITFIELD WERE TAKEN INTO CUSTODY AND TAKEN TO CENTRAL FOR QUESTIONING.

THIS WRITER THEN BEGAN TO WALK TO THE 500 BLOCK OF WILLING ST. WHERE THE SCENE WAS LOCATED AND THE VICTIM WAS SHOT. UPON ARRIVAL, THE VICTIM WAS ALREADY TAKEN TO THE CHRISTIANA HOSPITAL FOR A GUN SHOT WOUND. AT THE SCENE THERE WAS A SPENT CASING AND AN UNSPENT CASING BY THE VICTIMS RED CHEVY CAVALIER DE 213162. THERE WAS ALSO A WHITE TEE SHIRT NOT BELONGING TO THE VICTIM BEHIND HIS VEHICLE, COINS AND KEYS WERE ALSO LOCATED AROUND THE VEHICLE.

THIS WRITER ALSO SPOKE WITH THE WITNESS (FRANCISCO FAILEY [redacted]

Reporting Officer: PATROL PRADO - 7190    Pending Supervisory Review

ON RETURN TO CENTRAL ALL THREE SUSPECTS WERE MIRANDIZED, MUSTAFA WHITFIELD DID NOT WANT TO SPEAK TO THIS WRITER. MUSTAFA ONLY STATED THAT HE WAS GOING TO THE APARTMENT COMPLEX TO MEET A GIRL, WHO I DID NOT HAVE A NAME FOR.

MUSTAFA STATED THAT HE MET THE FEMALE ON THE INTERNET AND SHE WAS AN OLDER FEMALE NO FURTHER DESCRIPTION.

EMMANUEL ROBINSON WHEN STOPPED AT THE 200 BLOCK OF W. 4TH ST APARTMENTS ON THE 5TH ST SIDE HAD HIS SHIRT OFF. ROBINSON WHEN ASKED WHY HE WAS BARE CHESTED, STATED HE AND WHITFIELD WERE WRESTLING AND WHITFIELD PULLED HIS SHIRT OFF. HE ALSO STATED THAT, THATS WHY HE WAS WINDED AND SWEATING. AFTER BEING TRANSPORTED TO CENTRAL UNDER MIRANDA ROBINSON STATED THAT HE AND WHITFIELD WERE WRESTLING AND THAT WHITFIELD KEPT TELLING ROBINSON THAT HE WAS SKINNY. ROBINSON KEPT TELLING WHITFIELD THAT HE WAS BIG NOT SKINNY. ROBINSON THEN STATED, THAT HE WAS UPSET WITH WHITFIELD FOR SAYING THAT HE WAS SKINNY, SO ROBINSON TOOK OFF HIS OWN SHIRT TO SHOW WHITFIELD THAT HE WAS NOT SKINNY.

THIS WRITER ASKED ROBINSON WHY HE AND WHITFIELD ENTERED THE APARTMENT COMPLEX. ROBINSON STATED THAT HE AND WHITFIELD WENT THERE TO MEET A FEMALE SUBJECT. THIS WRITER ASKED WHO THE FEMALE WAS, ROBINSON STATED HE DID NOT KNOW. HE AND WHITFIELD MET THE FEMALE EARLIER THIS DATE WHILE THEY WERE WALKING AROUND THE CITY. WHEN ASKED HOW OLD THE FEMALE WAS, ROBINSON STATED ABOUT 16-18 YEARS OLD. IT SHOULD BE KNOWN, THAT WHITFIELD STATED THE FEMALE WAS AN OLDER FEMALE AND HE MET HER ON THE INTERNET.

THIS WRITER ALSO SPOKE WITH AKEEM COLEMAN UNDER MIRANDA COLEMAN STATED THAT HE DID NOT KNOW THE OTHER TWO INDIVIDUALS. IT SHOULD BE KNOWN, HE WAS OBSERVED RUNNING WITH THE OTHER TWO INDIVIDUALS WHO JUMPED OVER THE RECTORY WALL. AKEEM THEN STATED, THAT THOSE TWO INDIVIDUALS ATTEMPTED TO ROB HIM.

THIS WRITER ASKED WHERE COLEMAN LIVED, HE STATED ELSMERE. WHEN ASKED WHAT HE WAS DOING IN THE R.   HE STATED THAT HE WAS LEAVING HIS AUNTS AND GOING TO THE STORE AT 10TH AND PENNSYLVANIA AVE. IT SHOULD BE KNOWN, THAT 10TH AND PENNSYLVANIA AVE DO NOT INTERSECT THEY BOTH RUN EAST AND WEST. WHEN ASKED WHERE HIS AUNT LIVES, HE STATED 25TH AND JESSUP ST. WHICH IS NORTH OF THE LOCATION WHERE HE WAS STOPPED. COLEMAN REFUSED TO SPEAK AFTER HE WAS ADVISED OF THE LOCATIONS HE WAS GIVING.

THE WEAPON AT CENTRAL WAS RAN THROUGH DATA TO SEE IF IT WAS STOLEN IT CAME BACK NEGATIVE, IT WAS ALSO TAGGED AND PLACED INTO EVIDENCE.

DETECTIVES TOOK THE CASE OVER (SEE DETECTIVES REPORTS)

---

Reporting Officer: PATROL PRADO - 7190    Pending Supervisory Review

vability Factors    [X] Witness    [ ] M. O.    [ ] Trace Stolen Property    [ ] Suspect Named

*Exhibit H*

| | |
|---|---|
| 1  Q. Were they close enough to touch each other? | 1  Coleman? |
| 2  A. It is hard to say. Distance wise you can't -- | 2  A. Usually it is our normal protocol, we will |
| 3  perception wise you can't tell if they were that close | 3  bring them over to the vehicle, place hands on vehicle, |
| 4  to touch each other, but they were in a group. | 4  just a normal stop and proceeded to ask questions. |
| 5  Q. Now, you testified that two of the | 5  Q. What, if anything, did Officer Derbyshire? |
| 6  individuals -- | 6  A. As he was walking down towards the last |
| 7  A. -- made it over the wall, correct. | 7  location we had seen the subjects together, he |
| 8  Q. And one didn't? | 8  immediately found a weapon, a handgun. |
| 9  A. Correct. | 9  Q. And what, if you know, what did he do with |
| 10 Q. Did you see the one who didn't make it over | 10 that weapon? |
| 11 attempt to get over the wall? | 11 A. He immediately told me that he found a weapon, |
| 12 A. Yes. Yes. | 12 and as soon as we called in the stop we were advised by |
| 13 Q. And he could not get over? | 13 Wilcom, our radio room, they had just received a call |
| 14 A. Correct. | 14 for shots fired and that's -- you know, that's when |
| 15 Q. Were you able to get a description of the two | 15 Officer Derbyshire had located the weapon. |
| 16 individuals who went over the wall? | 16 Q. Did they broadcast the shots were fired? |
| 17 A. Being that that area is not well lit, I mean, | 17 A. They were given the -- I can't recall exactly |
| 18 it is dimly lit, dark clothing, they were thinner, you | 18 if it was -- it was the 500 Block of Willing Street, |
| 19 could tell they were a lot smaller than the one | 19 but I don't exactly recall. |
| 20 individual. But they were thin in stature and they | 20 Q. Is the 500 block of Willing in New Castle |
| 21 were able to jump over this wall pretty easily without | 21 County State of Delaware? |
| 22 any problems. | 22 A. Yes. |
| 23 Q. Could you tell what race they were? | 23 Q. Now, after -- strike that. |
| 118 | 120 |
| 1  A. No. | 1  What did you and Derbyshire do with Defendant |
| 2  Q. Now, upon seeing the individuals running, what | 2  Coleman? |
| 3  did you and your partner do? | 3  A. We detained him immediately. Placed handcuffs |
| 4  A. As soon as we saw them running and that occur, | 4  on him immediately and placed him in the patrol |
| 5  we had already started through the light going into the | 5  vehicle. And I think at that time that's when we made |
| 6  middle of the block, 400 block of West Fourth Street. | 6  the weapon safe. And from that point that's where I |
| 7  The larger individual who didn't make it over the wall | 7  went to backtrack to see if we could locate the two |
| 8  proceeded to walk northbound on the 500 block of West | 8  other individuals. |
| 9  Fifth. We exited our patrol vehicle, stopped him and | 9  Q. Where did you backtrack? |
| 10 asked to speak with him. | 10 A. Went back to the same location that Derbyshire |
| 11 Q. The individual you stopped in that area do you | 11 had found the weapon. I jumped over the brick wall |
| 12 see that individual in court today? | 12 to -- about six feet, jumped over that, went in the |
| 13 A. Yes. It is Mr. Coleman. | 13 courtyard of St. Peter's cathedral. |
| 14 MR. DONAHUE: Let the record reflect the | 14 Q. What did you do then? |
| 15 witness has identified Defendant Akeem Coleman. | 15 A. Went through the courtyard of St. Peter's |
| 16 BY MR. DONAHUE: | 16 Cathedral and checked some of the darker areas. There |
| 17 Q. Who took the Defendant Coleman into custody? | 17 is a chain link fence in the back of St. Peter's |
| 18 A. We had both got out of the vehicle. I was a | 18 Cathedral, a six-foot tall chain link fence went |
| 19 passenger, I believe, that night, so I had first | 19 throughout the courtyard, was in between the school and |
| 20 hands-on with him because Officer Derbyshire walked | 20 church, went through that courtyard and then came out |
| 21 towards the direction of where the other two were spied | 21 on Sixth Street, jumped over a smaller brick wall onto |
| 22 jumping over the wall. | 22 Sixth Street between the church and school. |
| 23 Q. And what did you do when you contacted | 23 Q. And once you were onto Sixth Street which |

**Page 137**

```
 1  them?
 2     A.  Fourth and West which is about a block and a
 3  half.
 4     Q.  Were you on Fourth Street or facing north on
 5  West?
 6     A.  North on West facing Fourth Street.
 7     Q.  Waiting for the light to change?
 8     A.  Yes.
 9     Q.  So did you see these guys where they came out
10  of?
11     A.  They were coming east on Fifth Street so you
12  can't tell where they are coming from because there is
13  a church there and fence but they were coming.
14     Q.  Did it appear they observed you?
15     A.  No. I don't think they observed us it didn't
16  seem like they saw us.
17     Q.  Who was driving that night?
18     A.  I'm sure I was a passenger that night because
19  when we got out of the vehicle I was the first one that
20  approached Mr. Robinson -- Mr. Coleman.
21     Q.  So you believe you were the passenger that
22  night?
23     A.  Correct.
```

**Page 138**

```
 1     Q.  And Derbyshire would have been driving?
 2     A.  Correct.
 3     Q.  When you saw these guys running did they mash
 4  down and accelerate?
 5     A.  No. Because when we saw them running that's
 6  when we went through the light. They were at high
 7  speed, high tailing it, and it was around the middle of
 8  the block was when they were already jumping over the
 9  wall. So we didn't speed up or anything because
10  Coleman began to walk, so we were just going to stop
11  them so there was no need to really high tail it.
12     Q.  Let me see if I can follow this then. You are
13  at Fourth and West?
14     A.  Correct.
15     Q.  And so you have got the light in front of you
16  and four lane Fourth Street ahead of you; correct?
17     A.  Correct.
18     Q.  You have to go in the 400 block of West Street
19  and you have Friends Meeting House and a little
20  cemetery there on the your left?
21     A.  Yes.
22     Q.  And go across Fifth Street and 500 block of
23  West Street now and it is about halfway up between
```

**Page 139**

```
 1  Fifth and Six that the two individuals who went over
 2  the wall went over the wall; is that correct?
 3     A.  No. They -- where they jumped over the wall,
 4  it is I would say maybe 15 feet away from the front
 5  door of the rectory. St. Peter's Cathedral rectory is
 6  where they jumped over the wall.
 7     Q.  For purposes is that fully up the block,
 8  halfway, three quarters?
 9     A.  No. The rectory is at the corner of Fifth and
10  West.
11     Q.  So it is closer to Fifth Street than Sixth
12  Street where they went over the wall?
13     A.  Correct.
14     Q.  And when they are going over the wall,
15  approximately where is your vehicle?
16     A.  We are already into the intersection going in
17  to the 400 block of West is when they are jumping over
18  the wall.
19     Q.  Going 20 to 25 miles per hour?
20     A.  I can't tell. Normal speed. Again, we
21  weren't speeding to the location.
22     Q.  So you are better than a block away and they
23  are already going over the wall?
```

**Page 140**

```
 1     A.  Correct.
 2     Q.  Could you see them clearly from that distance?
 3     A.  Only thing you could see was they were taller,
 4  one was larger than the other two, but it was dark
 5  clothing so you couldn't tell facial wise or who it
 6  was, it was dark clothing.
 7     Q.  You indicated two of them got over and the
 8  larger one tried to get over but couldn't get over?
 9     A.  Correct.
10     Q.  Are you sure about that?
11     A.  Yes.
12     Q.  Because your partner testified that you didn't
13  necessarily see anybody try -- the third person try to
14  go over the wall?
15     A.  That's what I saw. I was on the passenger
16  seat so I have the better view of what was going on.
17  We both saw them running, but I had the better view of
18  what they were doing because he was of course driving.
19  But that's --
20     Q.  Then that individual just continued walking up
21  the block?
22     A.  Yes. Started walking north on West Street.
23     Q.  When he is walking north on West Street did
```

*[handwritten margin notes: "Young Rado questioned bigger defense"; "x 7 th Rado"]*

*① page 1    Exhibit G*

## Trancript of Wilmington PD Dispatch Channel A → another channel
### October 14 2002 – October 15 2002

*6295 ←*

| | |
|---|---|
| Derbyshire: | 10-8, 17/Charles. |
| Wilcom: | 23:49. |
| 13/Charles: | 13/Charles. |
| Wilcom: | 10-3. |
| 13/Charles: | Unfounded 10-8. |
| 11 Charles: | 10-8, 11/Charles. |
| Wilcom: | 23:50. |
| Derbyshire: | 17/Charles. |
| Wilcom: | 17/Charles. |
| Derbyshire: | We have one stopped in the 500 Block of West. |
| Wilcom: | 23:53, 16/David. |
| 16/David: | 16/David. |
| Wilcom: | In 500 Block of Willing 500 Block of Willing coming in as shots fired. Several calls coming in. |
| 16/David: | Copy. |
| Wilcom: | 23:53. |
| 10/David: | If you don't have me, I am 10-8. |
| Wilcom: | 23:54. |
| 16/Charles: | We're 10-1. |
| Prado: | 17/Charles. |
| Wilcom: | 10-3. |
| Prado: | Did you come over and say you have reports? |
| Wilcom: | Yes, 500 Block of Willing. |
| Prado: | Okay, we have one stopped, we just recovered a weapon in the 500 Block of West. I am on foot looking for the other two. |
| Wilcom: | Alright 16/David move into the area. Do you have a description 17/Charles? |
| Prado: | We saw from a distance but they jumped over a fence in the rectory of St. Peter's Cathedral. I am on foot now. |
| Wilcom: | Copy. 16/David copy. |
| 16/David: | Copy block out. |
| Wilcom: | Units we have restriction on Channel "A" for shots fired. One recovered. We are on an area search for two outstanding. |
| Derbyshire: | 17/Charles. |
| Wilcom: | 10-3. |
| Derbyshire: | One was a black male in an all grey sweatsuit. He jumped some fences and headed eastbound toward Orange. |
| Wilcom: | Copy. Black male. Grey sweatsuit. Eastbound on Orange. Jumped through the fence. |
| Charles/2: | Charles/2. No officers involved in that shooting correct? |
| Wilcom: | 17/Charles. |
| Prado: | Negative. We weren't involved in the shooting. |

*How do we know 10/pa arrived at 3:56 it doesn't say.*

*Why didn't she advise officers what they were looking for.*

1



② page 2

| | |
|---|---|
| Wilcom: | Units on the area search. We have a possible victim of a Ida King. Possible carjacking. Victim is supposed to be at 514 Washington, 514 Washington outside, possibly shot in the foot. |
| Prado: | 17/Charles. |
| Wilcom: | 10-3 |
| Prado: | We have two stopped in the two hundred block of Tatnall. Can you have my partner respond to the location with that one? |
| Wilcom: | Officer Derbyshire. |
| Derbyshire: | Copy, 200 Block of Tatnall. |
| 10/David: | 10/David, I am in the area. |
| Wilcom: | 23:58. |
| Wilcom: | 10/David, Can you respond to the 500 Block of Washington, 500 Block of Washington, possibly 514, see if you can locate the victim, supposed to be outside has a foot wound, shot in the leg. |
| 10/David: | Give me a 10-2. |
| Wilcom: | 23:58. |

```
ORI#:  DE0020600  WPD  (3)        Dispatch Entry  10/1 '02    INQUIRY    CD@ESWS1
Address......: 599,,WILLING,ST,
Cross Street..:  ///                                          Loctn Type.. S
Incident Type.: 147 P SHOOTING    Priority: 2 InProgress..: Y
Business:                         License #:         State: __  ORI...: DE0020600D
NOTES LINE 1  : 31 HEARD2 GUNSHOTS, NFD                        Venue....... WILM
NOTES LINE 2  :
NOTES LINE 3  :                                                CALL SOURCE: TEL
Callers Name..: WATKINS,PAT,,                                  Phone.
-Incident Narrative Entry--------------------------------------CD1500S1-
  Incident#: 6294 WP Type:  147 P Location: 599 WILLING ST
  Detail Incident Narrative Information                        More: +
  ANOTHYR 31 STATES THAT 4 SHOTS OCCRD IN PRKNG LOT NEAR 400   23:54:14
  W 6 ST, VICTIM:BM,BURGNDY JCKT, BRN PNTS, LAST SEEN IN ALLEY 23:54:46
  WAY NEAR ABV LOC, LIMPING,                                   23:54:58
  VICTIM:ANTHONY MEEK,BM,5'8,DELAWARE PARK JACKT(MAROON),TAN   23:58:38
  PNTS, OUTSIDE OF [REDACTED]          VICTIM'S MTHR:ELMA      23:59:02
  MEEK, [REDACTED]                                             23:59:17
  17C HAD 1 STOPPD TWO FLED JUMPED OVER THE FENCE BY THE       0:06:51
  CHURCH SUSP BM,GRY SWEATSUIT EAST BOUND OVER THE FENCE       0:07:38
  ORANGE ST                                                    0:07:41
  Narrative:
-F3=Exit..F11=View2..F12=Cancel..F17=Top..F18=Bottom..F16=System-------
```

page 3

02 106294

Exhibit H

```
QRI#: DE0020600  WPD  (4)     Dispatch Entry  10/1 '02    INQUIRY    CD@ESWS1
Address.......: 599,,WI  ING,ST,
Cross Street..: ,,,                                              Loctn Type.. S
Incident Type.: 147 P  SHOOTING    Priority: 2 InProgress..: Y
Business: ,,,,,,,,,,,,,,,,,,,,,,,, License #: _____ State: __  ORI...: DE0020600
NOTES LINE 1  : 31 HEARD2 GUNSHOTS, NFD                          Venue....... WILM
  TES LINE 2  :
NOTES LINE 3  :                                                  CALL SOURCE: TEL
Callers Name..: WATKINS,PAT,,                                    Phone.
-Incident Narrative Entry---------------------------------------------CD1500S1-
 Incident#: 6294 WP  Type:  147 P Location: 599 WILLING ST
 Detail Incident Narrative Information                  More:
 ORANGE ST                                                  0:07:41
 SCENE WAS FOUND IN THE ALLYWAY IN THE 599 WILLING ST       0:08:03
 EDU WAS NOTIFIED                                           0:08:08
 DETECTIVES WAS NOTIFIED                                    0:12:27




                                                         Bottom
 Narrative:
-F3=Exit.. F11=View2.. F12=Cancel.. F17=Top.. F18=Bottom.. F16=System
```

page 4